Good, Your Honor. How are you? And you probably, obviously, did get notice that we did grant the permission that was asked for for you to argue the case. Yes, Your Honor. Thank you. Good afternoon. Don't thank us yet. Before you're done, you may not be thanking us for that. I recognize that, Your Honor. Good afternoon, and may it please the Court. My name is Michael Raphael. I represent the appellant, Mr. Samuel Rivera-Padilla. I would like to reserve three minutes of my time for rebuttal. Is that three? Three, yes, Your Honor. Though Agent Pausick was lawfully present when he observed Mr. Rivera-Padilla's... The request that was made by the agent, Pasurik, I guess his name was, Pausick, and it's kind of muddled, and the district court didn't parse through it very well, but he, as I understand it, he asked your client for clothes and identification in the same sentence? Your Honor, I understand from the record that he asked, he says to the court, I asked for clothing and where identification could be found, and then in the next sentence specifies that I asked him where clothing could be located. That's at page 79 of the joint appendix. Well, does it make a difference? I mean, the clothing thing, that's not an issue, isn't it? It's not like there's an ID issue floating around here. The clothing here is no issue. It's the identification. Yes, Your Honor. And they're not relying upon any implicit consent here? Yes, Your Honor. So you're arguing, and I'm not sure it's super clear to me, but you're arguing in terms of the interrogation one, interrogation two, that part of interrogation one was that initial statement, or are you arguing that, where are your clothes and identification? That's the interrogation? No, Your Honor. The interrogation is after the identification is discovered. Well, why wouldn't that be an interrogation? Ask the voice of evidence that I can prove your identification. That arguably could be an interrogation. So you're not making that argument? No, Your Honor, I'm not. I think that he, under the Dasein passage, under Leftwich, was entitled to ask of Mr. Rivera-Padilla where his clothes were. The most specific statement on the record, at page 79, is that he asked where the clothes were, and then at page 116, acknowledged that he does not recall whether he made any request of Mr. Rivera-Padilla to produce identification. That's different. That's why I was asking the question. We have to go back and look at the testimony. If he asked, where are your clothes and do you have any identification, as opposed to saying, where are your clothes, and then later saying, do you have any identification, it may be two different things. If it's part of the entire transaction where he's saying, do you have any clothes and do you have any evidence of who you are, and he's asking specifically for the defendant to show him where the officer can seize evidence to convict him of the crime he's being That may be a problem, but you're not relying upon that as part of the interrogation. I just asked you that. No, Your Honor. So help me get to what is the interrogation warrant? When does it start? The interrogation begins after Agent Palsak has located the wallet, searched the wallet by opening it, absent any warrant or exception to the warrant requirement, pulled out the Pennsylvania concealed carry permit, or the Pennsylvania firearms permit, gone to the stairs, and shouted down to Mr. Rivera-Padilla, where is the gun? Where is the gun in the bedroom? That was the interrogation following the unlawful search without a warning to which Mr. Rivera-Padilla responded that it was in the closet. And then Agent Palsak had him brought upstairs to stand three or four feet outside the door, point out where the key was to the fire safe box that the gun was located in, in the top shelf of the closet, opened the box and found the gun. So you're saying that he had a right to open the billfold? No, Your Honor. Okay. No, Your Honor. I didn't think you were. No. Once he opens the billfold, and it's really muddled, it's not a situation where the suppression testimony was really carefully parsed through. I couldn't tell if he opened the billfold and just saw the driver's license and the gun permit, or it looks like he pulled out from the billfold some cards in which were the driver's license and gun permit. I think he said he saw the top quarters, I think, of the phrase. Yes, Your Honor, that's correct. As soon as he opened the wallet. Then it's unclear maybe whether he pulled it out, but he saw a part of it when he just let the wallet fall open or opened it. Yes, Your Honor. He opened the wallet and saw inside. Up to there, no problem. He sees the gun permit, no problem. I'm sorry, Your Honor? Up to that point, there's no problem. He sees the gun permit, no problem. Then the problem starts. No, Your Honor, there is a problem immediately before that. When Agent Posick sees the wallet in plain view, it has, from its exterior, no evidentiary value. Okay, okay. You're saying, here's a wallet that you can see nothing. Yes, Your Honor. Here's my wallet. Shouldn't have opened it. You're saying when he does this, now you see my AARP card. Yes, Your Honor. So you know I'm an old person. You only do that by pointing that. I leave it alone. It may have been possible to make that conclusion without opening the wallet. Okay, let me zero in here on what troubles me. I agree with you, and I'm speaking only for myself, that there had to be justification for opening the wallet. Yes, Your Honor. And they suggested two things. They said that we were interested in opening the wallet because we frequently, people's wallets reveal their original source, country. Yes, Your Honor. And from my standpoint of view, that's not probable. There's no probable cause to believe that a wallet you don't know anything else about is going to reveal nation of birth. But the other thing they say is we had an arrest warrant, and we had a lot of evidence that we had put before a judge and said this is probable cause to believe that a crime has been committed. Yes, Your Honor. And when we got there, we needed additional strike needed. He identified himself verbally. Yes, Your Honor. But they said we looked in the wallet because we were entitled to confirm that this person was the person that had committed the crime that the court found probable cause to believe had occurred. Your Honor, I — Isn't that, isn't the purpose of opening it, isn't that probable cause to, isn't there probable cause to believe that finding identification of somebody under those circumstances is evidence of a crime? Your Honor, there may well be probable cause enough to support a seizure of the wallet, and we would not argue here that the seizure of the wallet was unlawful. But even that fullest measure of probable cause, that items of evidentiary value may be contained within a private container, as the Supreme Court said in Horton v. California, footnote 11, cannot allow a search of a private space. There must be a warrant or a warrant requirement, pardon me, an exception to the warrant requirement. Here there was none. Agent Polsak found — But plain view, okay, let me get it, sir, because that's what's, it's not your argument, it's not plain view you got to open the wallet. Is this a warrant for a crime? This is a warrant for an immigration violation, Your Honor. It's not a crime. Being, I know the assumption of Judge Staples, the question was that a warrant is for a crime, but in the immigration context, being out of status is not a crime. That's a good point. I stand corrected. But you may get a warrant, I believe, literally to seize somebody who's out of, you know, you understand what I mean by — Yes, Your Honor. Who's out of status for some reason. In other words, it's not entitled to be here for the purpose of removal from the country. You can seize them. You can seize them. Yes, Your Honor. And you do it at the border all the time. Yes, Your Honor, that's true. So I thought, I may be wrong, but I thought — That's a good point. I thought, and it wasn't clear to me in the record, whether it was like an illegal reentry having previously been deported. That would be a warrant for a crime. Right, but that's not in the record. But it's not in the record. It just says for immigration violations. Well, that's a hot issue, by the way, in immigration law. Yes, Your Honor. Like, I think you can get warrants that are not for a crime. That's true, Your Honor. And this was an immigration arrest warrant. Just for being out of status. And at page 62 of the record, you'll see, Your Honor, that if the immigration questionnaire is specified as not applicable to the question concerning when Mr. Rivera Padilla previously entered the United States. So this was not an illegal reentry. This was an initial entry without authorization. Now, the warrant that the ICE agents had when they came to arrest Mr. Rivera Padilla had in it a fairly detailed description of his age, height, weight, and general appearance. When they entered his home, he confirmed that he was, in fact, that Samuel Rivera Padilla. And at page 116 of the record, Agent Pawsik acknowledges that, yes, we knew we had the right guy. He says at page 94 of the record, we were getting the identification to grease the wheels, to make it easier in the immigration proceedings. Now, while the identification may have evidentiary value in the immigration proceedings, it was until the wallet was opened, until that private container was searched, invisible to Agent Pawsik. The wallet itself disclosed nothing of its contents. It was a closed private container entitled to protection from the Fourth Amendment. Agent Pawsik may well have had— But wouldn't it be a probable cause to believe if you have a wallet there, it's a reasonable conclusion to believe that inside that wallet you'll find things like driver's licenses and things like that? I don't know where his proof of origin is. Absolutely. But that is immaterial to the question of whether he could have opened the wallet at that point and searched it. That may have provided the fullest measure of probable cause for him to seize it, to isolate it, to preserve it for later examination for evidence. But not, absent a warrant or exception to the warrant requirement, and there was none such exception here, authorization for him to open the wallet, look inside of it, and find incriminating evidence, no matter how much he believed that incriminating evidence was contained within it. Excuse me. When you're saying no matter how much you believe, the plain view, and I didn't realize I had come to this, and I've done it myself, I think, in past cases, but there's a general view, I think, no pun intended, that plain view stands for much more than it does. And it's clear after looking at some of these cases, particularly one that wasn't really cited, Hicks v. Arizona, that plain view is not an excuse for anything other than a warrant requirement. Plain view doesn't give you probable cause. If you have plain view to seize something, then if you have probable cause to seize it, then if it's in plain view, that leaves the warrant requirement, because it doesn't make any sense in that context. But if you don't have probable cause to seize it, the fact that it's in plain view doesn't somehow jump over the Fourth Amendment. Correct, Your Honor. Although Arizona v. Hicks, the reason we don't rely on it is because it's a unique situation. In Arizona v. Hicks, the officer who was investigating an apartment where he was lawfully present had probable cause to seize the serial equipment to begin with. Well, that's correct, Your Honor. But the Fourth Amendment protects both possessory interests and privacy interests. A seizure affects the possessory interests, and a search affects the privacy interests. In Arizona v. Hicks, those two interests were coextensive because if the officer had probable cause to lift up the turntable to take it with him, he had probable cause to turn it over and see the serial, or he had authorization enough to see the serial number. And that's what Justice Scalia said. That was the distinction that he made. Correct, Your Honor. I think the better case for us is Walter v. United States, in which case FBI agents came into possession. They seized, lawfully, boxes containing what they believed to be pornographic videotapes. They believed these boxes to contain illicit pornographic videotapes because the boxes said they contained illicit pornographic videotapes. Nonetheless, when the agents opened those boxes and exhibited the movies, absent a warrant and without any exception to the warrant requirement, they violated the owner of those boxes' Fourth Amendment privacy interest, apart entirely from his possessory interests protected by the Fourth Amendment. They had the container in their possession. There was no exigency. Its contents were not in plain view until exhibited. There was no need to protect the officer's safety. Did they have a right to seize the wallet at all? I was wondering about that, too. He asks where is your identification or your clothing. At some point he sees a wallet. The officer goes upstairs and he sees a wallet, a closed wallet. He doesn't know what's in it, but he sees a wallet. Did he even have a right? Forget opening the wallet. Did he have a right to seize the wallet? Your Honor, before the district court, I would argue that, no, he did not, because the government failed to deduce evidence establishing probable cause that the wallet contained evidence. I'd also point out that the wallet itself was clearly not considered evidence as the agents left it behind. But you're not arguing that on appeal? No, Your Honor. I think that we don't need to reach that question because— You're conceding that for purposes of this appeal, it wouldn't have been the seizure. They could have seized it, but then they would have had to get a warrant at that point to actually open it and search its contents. For purposes of this appeal, Your Honor, I would assume for argument that their seizure of the wallet was valid, that there was probable cause to seize it. Because that really—it obviously helps you get where you want to go or you wouldn't have made the concession. But you just dropped me off the train when you started up the arrangement there. Because I became confused when you said that. Because if they had the right to seize it, a whole other panoply of complications kick in, like inventory searches, inevitable discovery, and all that kind of stuff. Your Honor, neither inventory searches nor inevitable discovery would apply in this case. Well, because they didn't build the record for it. Well, inevitable discovery, certainly they did not build the record for this. They made no attempt to introduce evidence supporting the fact that the discovery of the gun permit, which started this whole chain of events, was inevitable. They even tried to introduce evidence concerning inevitable discovery of the gun and omitted any evidence concerning inevitable discovery of the permit. On inventory searches, Your Honor, this is separate apart entirely from inventory searches. Inventory search policies apply when evidence comes into the government's possession and control. Did the agent testify to this? Or is this kind of your own expertise you're giving us? Such as it is, Your Honor, this would be my expertise. I don't question it, but I really don't need it right now. Yes, Your Honor. There was no evidence, Your Honor. Maybe go to the second statement. What is, in your view, the district court's error in finding sufficient intervening circumstances to break the chain of causation and allow everything to be kind of purged, if you will, because of the Miranda warnings that were eventually given five hours later? Well, Your Honor, first of all, because of the district court's incorrect decision that the gun permit, the search for the gun permit, was lawful, which the court sort of glosses over. It doesn't really examine whether this was a search, but just says that the wallet was examined. It goes first to the unworn confession as to the location of the gun and says that the following confession was not tainted by the unworn confession because then there was the gun, and because there is no need to suppress physical evidence recovered following an unworn confession, that the later confession to the possession of the gun and everything that followed from it was fine. If you go back to the previous step and correctly find that the search of the wallet was unlawful, then there is nothing whatsoever to break the chain of causation between that illegal search and everything discovered from that point on. The permit, the gun, the initial unworn confession, and the subsequent confession in writing. If the seizure was legal, if you're conceding, they pick it up and they go to a police station with it, okay? Now, they're not going to hand it to him. If he says, I'd like to take it in the cellar, they say, no, we're not going to give you your wallet to take in the cell. We're not going to take anything in the cell. Certainly not without us searching it first. But assume they don't, he doesn't ask for it. They now have to inventory. No, Your Honor, they do not. This is evidence. If you're saying it was legal for them, if you're conceding it was legal for them to pick it up, not to look at it. Yeah, that's right. You lost me with that concession. You pick it up, you take it, and you put it in a sack, you mark it, maybe you mark it in an envelope that, you know, one wallet. Okay, you now go down to a police station. Don't they have, don't the police have an interest at that point in knowing what's there so he can't say later, I had $300 in that wallet when you gave it back to me when I was released or before I was deported. There was only $200 in there or no dollars in there. And you've stolen $300 from me. Or I had a receipt of some kind which I could have gotten or a lottery ticket. I had the winning lottery ticket. I had the winning lottery ticket. I understand where Your Honor is coming from, but I think that inventory searches are You have the same problem, Judge McKee has, that once, in the real world, that once you say they could take it and they could bring it down to the police station, it just, something happens. I just can't see them. He's trying to help you. Your Honor, in every single case where there's a lawful seizure and an unlawful search, like Walter against the United States, like Coolidge against New Hampshire, like Horton against California, like Beringer, the police have physical custody of the container that they believe contains evidence, but they do not inventory it because it's not taken. So they didn't believe it had evidence. They just, they took it because the guy's going to be deported. They didn't want to leave his wallet behind. No, Your Honor, Walter against the United States is to the contrary. Walter against the United States had the pornographic video boxes that said, this is pornographic video. They knew it was evidence. They knew it contained items of evidentiary value. It was in their possession. It did not belong to them. They don't know what's in this wallet when it's closed. They really don't know. That's true, Your Honor. They certainly don't know there's a gun permit in there. That's not even predictable. True, Your Honor. But Agent Posick said that he seized it specifically because he believed it would likely contain it. Identification, which in any immigration proceeding is of evidentiary value. The container itself, however, was of no evidentiary value. They were permitted to seize it, to take possession of it, arguably, although I'm not conceding that, saying that only for the purposes of this appeal. When they then searched it. They certainly got to the police station. They weren't the least bit interested in evidence. They had him. They had his fingerprints. They had an immigration file on him. They had a lot of information on this guy. They should have warned him. True, Your Honor, they did. So let's assume they weren't the least bit interested down at the police station in this is evidence. They just had a wallet, okay, which you say they legally seized. No, Your Honor. Under those circumstances, they would not have been able to legally seize the wallet under any circumstance. If they believed that it contained nothing of evidentiary value, they took an item of personal property without any justification for invading Mr. Rivera Padilla's possessory interests protected by the Fourth Amendment. So their motive in taking the wallet. So you're saying you'll concede it, that if they seize it was legal, but only if they believe there was evidence in there. I would concede. If they took it just to have it so he could have it when he gets deported, then you say it's different. Your Honor, I would. We have to look at their motive now. Oh, that seems more reasonable to me than seizing the evidence. No, Your Honor. It's different than their motive. They took that wallet because they had arguably probable cause to believe it contained evidence. They seized it as a container that likely contained evidence, just like the FBI did with the video boxes in Walter against the United States. And what in the record leads you to conclude that that was their reason for taking it? They took it after they opened it and saw the gun permit. At page 94 of the record, Your Honor. But the moment they picked it up, the moment they picked it up, what is there in the record that says they believe there was something that they needed evidentially in that? For the simple immigration thing where they have clearly a good file on them. They got a warrant, which is unusual enough since there's about 10 million illegal immigrants in the country. For them to have a warrant means they got a pretty good file on this guy. At page 94 of the record, Your Honor, Agent Polsek says that he looked in the wallet because he believed it would contain identification, which can be of assistance in an immigration proceeding. And in the district court's holding, it says that he is looking for identification in an immigration proceeding is a valid law enforcement purpose. Now, that may give him, as the Supreme Court says in Horton against California, the fullest measure of probable cause to invade his possessory interest in the wallet. But because the wallet is a closed container and also has around it a shroud of privacy that cannot be invaded, absent a warrant or exception to the warrant requirement, when he searched it, when he opened it, he invaded without probable cause, I'm sorry, without a warrant, without any exception to the warrant requirement, a private space because he believed it contained evidence. In doing that, he violated the Fourth Amendment. If you can help me with this. Because where we were before in the concession, I think is what's confusing me. And correct me if I'm wrong here. You're conceding that at the time he picked it up, he thought that he might find the identification in it which he could use in the removal proceeding, which that would be evidence. And at the time he picked it up, he had reason to believe that, so that would be reasonable. That doesn't mean that he had the ability to open it without a warrant. But isn't that exactly what plain view gives you? It gives you a way around the warrant requirement? It gives you a way around the warrant requirement to seize items of evidentiary value when their evidentiary value is plain. Well, why wouldn't that be plain? If you're seeking for identification, the first place you'd look for identification would be his wallet. That's true, Ron. Not nationality. But the wallet itself has no evidentiary value. It is a container that likely contains items of evidentiary value, just as was the case in Walter against the United States. Counsel, let's assume they seized the wallet and there's no gun permit in it, nothing, just identification. Goes to a removal proceeding and they introduce evidence from the wallet. They say, here's, this proves that he's here, here's, you know. They actually use something in the removal proceeding. They use whatever he has as driver's license. It's something they find in there they use. Would there be a violation of the Fourth Amendment? Could they somehow or other, could he defend and say, you can't remove me because you've used evidence that you took in violation of the Fourth Amendment? This is a non-criminal proceeding now. They're just removing him because he doesn't have status. And they use something in that wallet to bolster their case. Your Honor, not being familiar with proceedings in immigration cases, and I apologize, I'm not sure what rules of evidence would apply in that case. Remember, they didn't come in a criminal, at least arguably, I can't tell, the record's unclear. They didn't come here in a criminal with a criminal warrant. They didn't come here looking for evidence of gun possession. They came here, as far as I can tell, to remove somebody who was out of status. No, there's nothing on the record that would suggest that he knew, the officer knew, the agents knew, that there wasn't any gun possession or any underlying criminality. No, Your Honor. That's a civil proceeding. That's a civil proceeding. Yes, Your Honor. Okay. And one in which there were broad powers to the government. True, Your Honor. They open the wallet. They don't find a gun permit or anything like that. They just find identification stuff, but they use it. They find stuff in there that's helpful to them. Maybe they find proof of how he entered illegally. Maybe they find, you know, they find stuff that they then use it in the immigration. Is there a violation? See, that's what's confusing me is the interplay between a non-criminal proceeding, which these agents thought they were doing, suddenly gets converted into a criminal proceeding when they find the gun, really, at that point. They later on find out that his application was illegal and he had lied on it. But at that point, they don't even know that. Your Honor, immigration proceeding or no, when they entered his home. Don't think they grabbed it out of there. He just put it in there, and you're taking out of it, and it being in there is what's confusing us. It greatly complicates the issue, and it's very interesting. I don't know what the answer is either. Your Honor, I think that even allowing for an immigration proceeding, the immigration agents who entered his home needed justifications under the Fourth Amendment. They had that. It's true, Your Honor. They did, to enter his home, to arrest him, to conduct a protective suite, to search his grab area, to take items of obvious evidentiary value in plain view, but to look inside a closed container. Because the boxes in Walter that you're talking about, to me, they're different. I'm trying to explain. I'm trying to intellectualize why they're different other than just a visceral reaction that a box that says pornographic material on the outside of it is different. I guess it depends on the guy's billfold. It does, Your Honor. Your Honor, I don't think it is different. I know you don't. Your Honor, the Supreme Court in Ross v. United States said that protections to containers, all closed containers, extend equally to all closed containers, no matter their type or their outward worthiness. In Smith v. United States, the closed container was a crumpled over paper bag. And in Horton v. United States, the Supreme Court says even if the item is a container, its seizure does not compromise the interest in preserving the privacy of its contents because it may only be opened pursuant to either a search warrant, an address in citations, or one of the well-delineated exceptions to the warrant requirement. But you can sketch this back to plain view. You've used this some time for about a minute. Let's hear from Mr. Aguari and then I'll just let him go again. Yes, Your Honor. Good afternoon. May it please the Court. My name is Vineet Aguari and I represent the United States Government. Your Honor, I know you were asking Mr. Raphael the questions about whether or not this is truly a civil proceeding or a criminal proceeding. And while this issue was not raised by either party in the briefing or below, I believe there are some very criminal aspects to this. Clearly, Your Honor. Yes, Your Honor. But even at the time, there is an arrest warrant that's issued by an ICE. It's another ICE officer. Actually, it's not a judge that issues the administrative warrant in this case. But they do come in. They place the defendant in handcuffs. They are doing protective sweeps. When they bring the defendant back to ICE administrative offices, he's placed in a holding cell with the other folks that were picked up on administrative warrants. But won't the officer have the right to open the bill for them? Your Honor, we believe that the officer was acting reasonably, and this was a reasonable search because there was probable cause here, as the agent testified. But the evidence wasn't in plain view. The evidence that is driving this right now, the gun permit, that was clearly not in plain view. In order to get into the plain view doctrine, you may get past probable cause if the gun permit had been lying out there. Let's assume, I'm not sure this is valid, but let's assume the gun permit was sitting on the table. Let's assume further there was probable cause to believe that that gun permit was evidence of a crime. I'm not sure it would have been, frankly, unless they thought he was a convicted felon, and that's not in this case. Why would they have probable cause to seize the warrant? The wallet, Your Honor? The wallet, yeah, not the warrant, the wallet. Your Honor, the agent testified that in his experience, wallets often carry proof of identification. Sometimes, in his experience, he would find birth certificates. Wallets contain evidence of drug dealing, drug smuggling. The fact that he- Drugs themselves. Yeah. In fact, to me, that hurts you. If the agent says, wallets frequently contain stuff that I can use as evidence. I don't know if that's plain view. The appellant would say, or conceded, if that's the right word, that you had enough to interfere with his possessory interest. In other words, you could seize the wallet. He agreed with that. And seemed to implicitly agree that you could then apply for a search warrant at some point. On the ground law, you'd be looking, the basis for your search would be in a civil case. That confuses me a little bit. You would say that I can find proof of identification that I could use in the removal proceeding, which I- A search warrant in a civil case is a little unusual concept to me. I'm not saying it isn't done. It's just that I'm not familiar with it. But remember, at that point, you would have no reason to suspect, certainly that he owned a gun, that he legally got in possession of a gun, that he had lied when he filled out an application. All that criminal activity, you had no reason to suspect any of that, or evidence of any of that. All you had reason to find is that you might find something in that wallet that would help you in the removal proceeding. That's correct, Your Honor. So he conceded, you can take the wallet for that reason. I don't know whether he should concede that or not, but he does. He concedes that you could take that, it would interfere with your possessory interest, and then you could take it down and then apply, again, you apply to a judge for a warrant to find evidence to support a civil proceeding? Maybe. Yeah, because the problem here is, again, even if there's a gun permit, it's the same problem. If the gun permit is sitting on the table in plain view, on this record, I don't know why the agent would have probable cause to believe that that gun permit was evidence of a crime. Well, Your Honor, I believe the agent would have probable cause in that scenario because this is an illegal alien. He testified to that? Yes, Your Honor, and one of the crimes the defendant pled guilty to with preserving his right to appeal on the Fourth Amendment issues was that he was an illegal alien in possession of a firearm. Before having a legal right to possess. Yes, Your Honor, under Title 18, Section 922G. So that in itself would give the agents, and obviously it would be a much more clear-cut case than we have before us today. But I do believe that just based on the agent's experience, and while the government's not – How would you distinguish Walter v. U.S.? Yes, Your Honor, I think that there are certain practicalities that really cause the differences, I believe, between Walter and here, and one of those is the FBI and Walter was already in possession of the films. They already had possession of those films back at the FBI offices. They weren't actually in a defendant's home with two other adult males in the home at the same time in the upstairs bedroom when they discovered. I think that the practicalities are very different between the two cases. But there's – having said that, Your Honor, there's no – we're not arguing there are any exigent circumstances or public safety exceptions at that point. Doesn't that hurt you? It seems to me Walter is a much more clear case. It's inventory, it's – it seems to me Walter would be a much clearer case where you would win. If Walter wasn't appropriate because he interfered with the privacy interest, how does the search here not interfere with the privacy interest? Your Honor, the government believes just that because the wallet is distinctive in that while we're not advocating for a rule – a special wallet rule in any way – Well, you are. How do we write the opinion without getting the special wallet rule? Given Walter, how do we do that? I'm sorry, Your Honor, in Walter – Given Walter, given the cracks that we have to write in, how could we come out of this case with anything but a wallet exception to the Fourth Amendment? Isn't that where your argument gets us? You just said it. The agent said it. I know what's going to be in a wallet. Yes, Your Honor, the agent did say that. But I think given the totality of the circumstances, the agent's experience, he knows what's in the wallet. How much experience do they have to know what's in a wallet? All you need is a driver's license.  You know what mom and dad carry in their billfolds and purses. If you're saying that his experience showed him that there'd be identification in a wallet that he could use to tie the defendant to the status he's been arrested for. It could be a letter from home. He could have a letter from his mother in his native country could be in a wallet. Pictures. We have a hard time writing an opinion that doesn't create an exception for a very special set of circumstances for a wallet. Wallets, which may be the most – which should be, perhaps, the most private kinds of property for both possessory and privacy interest will become the least because of the character of it and what the officer could reasonably expect to find in it. Therefore, there's a lighter burden on interfering with either the possessory or the privacy interest. Your Honor, I think – yes, Your Honor. I think what distinguishes this case from – and why we're not advocating – or one of the reasons why we're not advocating for a general wallet exception here. Because you'd lose. That would be one, Your Honor. The other would be that this is a wallet that was seized and searched in an immigration case. The appellant cited the Baring Garrett case in the Second Circuit, which was a case where the agents opened a wallet when they were arresting a defendant on drug charges, and they used the contents of that wallet for large denomination bills to complete evidence in their case in the drug case. That's the situation where when you're arresting someone on drug charges and you see a wallet, there's really – the agent doesn't have probable cause to believe there's going to be large denomination bills or small denomination bills. The agent would have probable cause to believe there's identification in the wallet, but that was a drug case, not an immigration case like we have in this case. But I think that goes to what Mr. Raffaello was arguing about the distinction between the privacy and the possessory interest. I agree, Your Honor. Once you can open it, what's in there then would be, in plain view, if you can immediately recognize it's incriminating or of injury value. Yes, Your Honor. There's definitely two – I agree Mr. Raffaello's correct. There's definitely two distinct issues there between the seizure and the search, and I think that's correct. If I could, I'd also like to address the second issue, which is the written confession at the ICE offices, which the parties – Before you do that, that's because I'm asking about where's the gun, and why isn't that the kind of thing which should have been preceded by Miranda? And if it is not, and I guess you're conceding that it was, that it should be preceded by Miranda, aren't you? Where's the gun? Yes, Your Honor, the government and district court proceedings did not move for the admission of that evidence, and Judge Golden agreed to that. Why would that be so directly connected to the second statement? You've got the same agent involved in the interrogation. Why wouldn't that be sufficient to give you the fear of the poisonous tree? Where's the break in the chain of circumstance? He's thinking to himself, well, geez, I already got the gun. I told him where the gun was. I got the gun. I better hope for the best I can get here and cooperate and give him a statement. That's what he's asking me for. The statement is about the gun, and would there have been a statement had there not been an illegal seizure of the gun? Yes, Your Honor, and I think looking at the factors in Brown v. Illinois, the temporal proximity in the intervening circumstances at best from the government's viewpoint is awash, and I realize that's the government's viewpoint. It was a five-hour period between the written confession at ICE offices and what transpired in the House. Having said that, though, the intervening circumstances were not anything that would weigh in favor of admission. The defendant was in a holding cell. He was being processed and fingerprinted. It was the same agent. However, I think that the third and most important factor under Brown is what really favors admission in this case is the fact that there was no flagrant official misconduct whatsoever. The agents were acting reasonably both in opening the wallet and also in the unwarranted colloquy they had of the defendant regarding the firearm. Now, there's two. Why were they acting reasonably in opening the wallet? What makes that reasonable? Your Honor, our position, Your Honor, would be that the agents believed they had probable cause, and they had probable cause in finding evidence. Probable cause of what? Evidence of an immigration crime, Your Honor, as far as identification documents. Crime? Immigration crime? What immigration crime? Yes, Your Honor. This would be the administrative proceeding. That's a big difference. What probable cause did they have? I mean, I go on two steps. I don't see the probable cause really in taking and seizing the wallet. But let's assume that's conceded. They then take it down to the station with them. The notion that they're going to get a search warrant to get identification for a proceeding where they have more than enough evidence already to throw them out of the country is, to me, you know, only in a lawsuit could you get that kind of allegation. I defy you to find, to probably find a case anywhere where they. Well, that'd be like 10,000 people here illegally. Yeah, in a pure immigration case that they're getting search warrants. I don't even know if you could get a judge. I don't know what a judge would say. I want a search warrant to see if he has a driver's license. Why are you doing that? We're going to throw him out of the country. Did he commit a crime? No, we don't know anything about any crime. We just know he's out of status. We want to make sure he is who he is. We already got a warrant to seize him. And he told you who he was. And he told you who he was. He hasn't denied who he is. He hasn't said, I'm not so and so. You got the wrong guy. So, I mean, in a typical case where you find a suitcase in a trunk, where you find that they, you know, this is a box of porn, the theory is you lose your probable cause that there may be evidence is good enough for the seizure. But then you go get a search warrant because there's evidence of, you have basis for believing there's evidence of a crime. That scenario just doesn't seem to me to fit an immigration case where you really don't need anything in the wallet to get rid of him. I mean, to, you know, deport him or remove him, I guess is the word you use. And the notion that you're going to, like the suitcase, you're going to take it, then get a search warrant. Or like cars, sometimes you can tow a car, but you can't look into the trunk or look into the car until you get a warrant. There's a whole line of cases dealing with that situation. I just don't see that here. Unless he was being arrested for an immigration crime, you know, but there's nothing in the record that indicates he was other than out of status and meaning he had no right to be here in the country. And they, for whatever the reason, they decided to go get him. And they went and got him. And so I just don't see that, I don't see where the evidence, you know, that you're, and if you really thought there was evidence there, that somehow you're going to take the wallet and then go get a search warrant. None of that makes any sense. It just doesn't fit this case. Personally, obviously I can't speak to the three judges. It's troubling, it's troubling. I'm not sure whether there's a concession about the seizure of the billfold, too. I find the seizure of the billfold troubling. Well, Your Honor, I think the seizure of the billfold wouldn't be much different than the locker in Chadwick, where I think that the Supreme Court ruled that the government was certainly entitled to seize the footlocker and then go get a search warrant to open its contents. That was a criminal case. Yes, Your Honor. All those are criminal cases. Those are cases where you've got, you suspect a crime, you arrest somebody for a crime, and you're looking for evidence to buttress. Nobody had proof beyond a reasonable doubt. Well, that's not the standard in a, you know, I mean, there's reasons why you go out and have a right to get a search warrant for evidence. Government has a very heavy burden of proof in a criminal case. But in a deportation case, it'd be one thing if he says, I'm not the guy, I'm not the guy, I'm a different Padilla. Then I could see the agent saying, well, show me some identification that proves you're not who you say you are. Or you're not who we have a warrant for. But that's not the case here. He's never denied he is. In fact, he opened the door when they said, I'm here for so and so. He came down and opened the door. He didn't say, I'm sorry, go to another house. You got the wrong address. You got the wrong guy. It was never an issue in this case about who he was. And the other thing, the five hours seems to cut both ways. Because you can clearly, in the cases that have gotten into this, you can clearly keep someone under detention sufficiently long to wear down their will, wear down the independence of their ability to judge and exercise free will, and make it more likely that once you give them a Miranda warrant or warnings that they will confess. So the fact that it was five hours after the initial event, I'm not sure if that helps you. I initially thought it hurt you. I can see your point. So you might have something there. But at least in my mind, it becomes a wash. Because the whole thrust of the statement is about that which they got illegally. I don't know where the intervening break of circumstance, I don't know where the causation is broken. They got the gun illegally. And then they exploit illegality. That's all they ask about is this gun that they found. Because now we've gone from a removal proceeding to a criminal prosecution. Yes, Your Honor, as I said, I believe the temporal proximity and intervening circumstances are at best a wash from a government standpoint. But we do believe that there was a lack of flagrant and official misconduct. When you take a look at the case law, when you have Taylor v. Alabama and Brown v. Illinois on one end of the spectrum, where you have pure fishing expeditions, arrests without any valid probable cause or warrant. In this case, there was a valid arrest warrant for the defendant. And at the other end of the spectrum, you'd have the Rawlings case. I think this case would fall somewhere in between. I think it would be much closer to the Rawlings than it would be to the flagrant and official misconduct you'd have in Taylor and Brown. Is it called a warrant, actually, that they signed? Yes, Your Honor, it is. And it's signed by whom? Your Honor, it's signed by another ICE official. It's not a judge. There hasn't been a judicial determination of probable cause. I think that's right, Your Honor. It's really an administrative proceeding. But it's basically an administrative way in a civil matter of bringing this guy, you know, into the custody of ICE so they can deport him. Yes, Your Honor. For being out of status. I think that's right, Your Honor. And I believe, in the record, the person who actually signed the warrant was actually the agent posit supervisor who was also in the house with him. Clearly, you'd admit there are big Fourth Amendment problems with that, if we were in a criminal context. Yeah, but see, it applies here, too. When you have a warrant, you've already had a judicial determination. There's probable cause that that person committed a crime. You don't even have an act. Some of the exceptions, like the search incident to an arrest, you know, come from the fact that there has been that judicial determination. Here, you just have the administrative agency charged with removing illegal aliens, in effect creating a mechanism for seizing somebody and removing them from the country. I think that's right, Your Honor, in that there certainly was no judge that signed off on that warrant. Having said that, though, the agents were acting under their lawful duty. ICE is charged with issuing those warrants. I'm not saying the agents did anything wrong in the sense of arresting him. They had a right to arrest him. It's just the seizing of the wallet and converting this to a criminal activity. Yes, Your Honor. I think that's the problem. Yes, Your Honor. I do believe, though, this is a far cry from the egregious circumstances in the Taylor and Brown cases. But, you know, that's not the only test. I mean, it seems to me there was significant exploitation here. It's not an egregious kind of intentionally wearing down the will. I don't think they clearly didn't. In fact, it appears here, and maybe Mr. Raphael would disagree, but it looks like everybody was acting in good faith doing the job. But that doesn't necessarily mean that what they did was legal or appropriate. Yes, Your Honor. Thank you very much. Mr. Raphael, I think we should deliver. Did I pronounce your name correctly? Is it Raphael? You are. One of the few. One of the few ones I've got right? No, one of the few people that pronounces my name correctly on the first try, Your Honor. First of all, let me say, and we are not conceding, that the seizure here was supported by probable cause. No, is that because Mr. McLaughlin whispered in your ear? No, Your Honor. I wanted to make that clear after the argument. I had suggested that we assume that for purposes of argument because I thought it would simplify the argument. I was incorrect. We are not conceding that. The seizure here was not supported by probable cause because there was no purpose whatsoever in taking the identification. You did say that. At page 116 of the record, Agent Pawczyk confirms, we knew we had the right guy. And at page 94 of the record, he says, I was getting the identification documents because it would grease the wheels, because it would make the immigration proceedings go more smoothly. Second, I would like to say that the government adduced no evidence, as Your Honor pointed out, supporting warrant requirement exceptions for an inventory search or inevitable discovery. They didn't raise it below and they don't raise it here. And accordingly, under United States against Mosley, I believe that that forecloses the possibility of a finding that either of those would justify the seizure or the search in this case. Finally, regarding the fruit of the unlawful seizure, the gun permit, the gun, the first unworn confession, and the subsequent signed confession, contrary to what the government says, nothing purges the primary taint of the illegal seizure. There is insufficient time. Taylor against Alabama involved a six-hour lapse of time. This case involved a five-hour lapse of time. As in Taylor against Alabama, there are no intervening circumstances. Mr. Rivera-Padilla was in custody without access to a lawyer, without speaking to any member of his family for that entire time. His only exposure to people was in interrogation and foreboding procedures. And finally— You're not arguing that his will was borne down. No, Your Honor. They had not known about the gun. They never even asked him the question. Correct, Your Honor. The question never would have even been asked, no matter how many hours, because he was destined to stay in custody forever at that point. Yes, Your Honor, that's correct. Until he left the country. And the brown factor that is strongest for us is the official misconduct because Agent Posick, when he finished with the immigration questionnaire, began immediately with the proceeds of the illegal search. He asked Mr. Rivera-Padilla the first question, handwritten question on page 62 of the appendix, asks him about the caliber, action, and manufacturer of the gun. He started right there and let Mr. Rivera-Padilla know, through exploitation of the proceeds of the illegal search, that he knew everything already that Mr. Rivera-Padilla had to say. He let Mr. Rivera-Padilla know that that bell had been rung and there would be no further harm in Mr. Rivera-Padilla answering his questions. Because of that direct exploitation of the illegal search and its proceeds, all three Brown v. Illinois factors weigh heavily in favor of a finding that the fruit of this unlawful search, the gun, gun permit, first confession, and second confession, must all be suppressed as fruit of the poisonous tree. Thank you, Your Honors. Can I ask this one question? Sure, go ahead, sure. Could you phrase the issue in this case, one way of phrasing what the issue is, is does the arrest of an alien pursuant to an administratively issued warrant give the arresting officers the right to seek evidence at the place of arrest, which would, to use your expression or the agent, grease the wheels of his removal? I think the issue could be phrased that way, Your Honor. I think it could be framed that way. I just don't know of any of them. Maybe there's authority out there. It wasn't really briefed that way. But that's what it comes down to. I mean, they're arresting the guy and somebody gets hit. You know, if we had some identification in his wallet, maybe it would make it a little easier to get rid of him. Even though he hasn't challenged his identity or anything like that. Does that amount to probable cause to steal, in a sense, the most personal thing that one has, which would be your wallet? Your Honor, I think it's… You're a 16-year-old boy. You certainly don't want somebody searching your wallet. I was a boring 16-year-old boy. Actually, I wouldn't have minded. You were pure. I mean, this is some areas that have not been briefed. It would be helpful, I think, to get 28 J letters from both of you if you want to submit any additional authority. This could end up being a hugely important case because of the number of immigration cases. Probably a third of our caseload now are immigration cases, not always overstaying visas or illegal entry. A lot of them are subsequent criminal prosecutions that disqualify someone for continuing to stay. But this could become a very important case. Can I add to that? When they seized, I can't remember if it was Iowa, they went to a factory and they seized hundreds of people. In fact, in a couple of locations. And what they did is when they ultimately got hold of their wallets, they got social security cards. They found out that most of them were phony. Then what they did is they bought criminal charges. They were arrested solely on status charges, that they were illegal aliens, not the non-criminals, just those administrative. But then they turned them to encourage them to leave voluntarily. They found social security cards in many of them and they indicted them for the crime of getting a phony social security card and then offered them deals which basically were time served and you agree to get out. There's no case law on it. There wouldn't be any case law. And the public defenders accepted the deal very, very reluctantly. And they thought it was vastly unfair, but they basically said, what choice do we have? Either we put this guy in jail forever or for a long, long time fighting a case or we let them get back with no more time in jail to their home countries. And so there is potential for abuse. There really is. Tremendous abuse. And taking an administrative warrant, a warrant that's not a criminal warrant, using it as a basis for searching a wallet because what at least I read is that the first thing a lot of illegal immigrants do, and I've had tried cases on the issue, is get some form of phony identification, frequently off the phony social security card, phony driver's license. So there's likely to be, and the government has used that. When they find that, they then turn an administrative case into a criminal case. Not for a gun. That was just a pure happenstance. But there are other crimes that are very common that they might find if they search a wallet. Yes, Your Honor. Related to immigration, like a phony driver's license, phony identification. Social security. Phony social security. So I think there are implications. There really are. And I'm curious, in an immigration context, if somebody has a nonjudicial warrant, walks into a house to arrest somebody, what rights do they have? And specifically, do they have a right to seize or search a wallet? Because they are very, very likely, not very likely, but at least there's a strong possibility that they will find evidence of a crime. Not the crime of owning a gun. That was just out of the blue here. But evidence of phony identification. Yes, Your Honor. And they could turn what is an administrative arrest, as they have done in other places in the country, into a criminal matter. And then use that as leverage. That really greases the way out of the country. Certainly. And there probably are cases, because of the number of administrative police inspectors going in to find evidence of criminal violations, there are probably cases out there. Personally, I don't know them. I can't speak to those guys, but if it's a 28-day letter addressing, really, what can an arresting, I use the word arrest, arresting officer, ICE officer, do with respect to an administrative, and I'm stressing this not just to you, although you're blocking the view. I apologize, Your Honor. Just what can an ICE officer do when he comes with just an administrative, you call it a warrant, but to me it's just kind of an administrative piece of paper that another ICE agent has signed. There's clearly not a Fourth Amendment warrant. Yeah, it's not a real Fourth Amendment warrant. Do, and when you talk about seizing a wallet, you are talking about finding evidence of other crimes, but the crime, this case has kind of been distorted because we're all talking about a gun effect. And ironically, just before the icing on the cake. But they actually could probably find in a significant percentage of cases, another crime. And that relates to phony Social Security, phony driver's license. And ironically, he had a permit, and he kept, I don't know how old the stepchildren were, but he had the gun locked and secured from the stepkids. It's a really different kind of case. You don't often see gun permits in cases. And I understand in his situation, he couldn't have a gun, so the permit was his problem. But he also was taking care to keep the gun, apparently keep the gun secured inside the house, which does not help him one iota, in terms of his criminal case, but it's a different. Let me just say, you've argued once before, and I know you're a legal writing specialist. I'm not totally sure what that means, but we gave you permission to argue. You argued very, very well on the last case, which I cannot remember now, but I remember you made an impression on the panel. Thank you, Your Honor. Let him do it again. He did a good job. Yeah, the old beard. Let the old beard sit down. Yeah, let the old guys out the pasture. How long have you been in the Public Defender's Office? I've been with the Public Defender's Office for two years, Your Honor. I came in September of 2006 to the Appeals Unit, and in July of this year, moved to the Trial Unit. Okay. You do a very good job. Thank you, Your Honor. I had a callus that started just about the same time. Think about the calls of length. Court is adjourned until 2 p.m. February 30, 1938.